UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA

                      CASE NO. 20-CR-10005-LSS-1

UNITED STATES OF AMERICA,
                                        Key West, Florida
                  Plaintiff(s),
                                        January 10, 2020
            vs.

YUHAO WANG, JIELUN ZHANG,

                  Defendant(s).       Pages 1 - 52
------------------------------------------------------------

                             HEARING
              TRANSCRIBED FROM DIGITAL AUDIO RECORDING
                BEFORE THE HONORABLE LURANA S. SNOW
                  UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

FOR THE PLAINTIFF(S):  JONATHAN KOBRINSKI, ESQ.
                       UNITED STATES ATTORNEY'S OFFICE
                       99 NE 4th Street
                       Miami, FL 33132
                       (305) 961-9161
                       jonathan.kobrinski@usdoj.gov

APPEARANCES (CONT'D)

FOR THE DEFENDANT(S):  JUAN MICHELEN, ESQ.
Yuhao Wang               FEDERAL PUBLIC DEFENDER'S OFFICE
                         One East Broward Boulevard
                         Fort Lauderdale, FL 33301
                         (954) 356-7436
                         juan_michelen@fd.org


FOR THE DEFENDANT(S):  HECTOR L. FLORES, ESQ.
Jielun Zhang             BARZEE FLORES, P.A.
                         40 NW Third Street
                         Miami, FL 33128
                         (305) 374-3998
                         hectorflores@barzeeflores.com


TRANSCRIBED BY:        Joanne Mancari, RPR, CRR, CSR
                       Court Reporter
                       jemancari@gmail.com

Thereupon,

the following proceedings were held:

THE DEPUTY CLERK:  Calling case No. 20-5002-Snow. United States of America v. Yuhao Wang and Jielun Zhang.

Counsel, please state your appearances.

MR. KOBRINSKI:  Good afternoon, your Honor.  Jonathan Kobrinski on behalf of the United States.

MR. MICHELEN:  Good afternoon, your Honor.  Juan Michelen, assistant Federal Defender, on behalf of Mr. Yuhao Wang, who is seated almost next to me.

MR. FLORES:  Good afternoon, your Honor.  Hector Flores, appointed on behalf of Jielun Zhang.

THE COURT:  All right.  Please be seated, everybody.

We are here for a pretrial detention hearing.

Do we have an agent in court?

MR. KOBRINSKI:  Yes, your Honor.  Special Agent Chris Klettheimer from the Federal Bureau of Investigation.

THE COURT:  All right.  Agent, if you want to swap places here.

You may proceed by proffer, and the agent is available for cross.

MR. KOBRINSKI:  Thank you, your Honor.

This is a case where the defendants unlawfully entered a sensitive military facility for the purpose of taking photographs, in violation of Title 18, United States Code,

Section 1382.

Mr. Wang and Mr. Zhang are citizens of the People's Republic of China, here on student visas, studying in Michigan, and they wound up in Key West trespassing on a secure military installation, and they took photographs that included photographs of another secure military facility across the waterway.

They were on Sigsbee Park Annex, which is a secure military facility that's only accessible by land through one road that has a gate and a sentry, and then they were taking photographs of Fleming Key, where there are other substantial military assets, including special operations assets.

On the morning of January 4, 2020 -- and I'm sorry. I should have mentioned this at the outset, your Honor. The government is only proceeding on the basis that these defendants are risks of flight.

So in the morning of January 4, 2020, Mr. Wang and Mr. Zhang arrived by car at that guard station at Sigsbee Park Annex in the naval air station of Key West. It's a secure military facility with restricted access, that I've already described, including that guard post, posted signs that advise no trespassing, no photography, and those signs include universal signs where there is a picture of a camera with a circle around it and then a line through it indicating that photography is prohibited.

Mr. Wang, when they arrived, Mr. Wang was driving and Mr. Zhang asked to go to the base, and a uniformed Navy master at arms working the gate said they could not go unless they had valid military identification.  Expressly that term, military identification.

Mr. Wang and Mr. Zhang stated they did not have military identification.  So they were told by the master at arms that they could not enter the base because it was that one road to get onto that, I guess, separate island.  They were instructed and directed to make a U-turn, and they were also -- the master at arms that instructed them to make that U-turn also signaled to them to make the U-turn and pointed to where to turn, that they needed to turn.

Mr. Wang and Mr. Zhang proceeded to drive down the road in contravention to that direction and to that order of the master at arms and they proceeded onto the Sigsbee Annex. So naval security forces were called by the master at arms, who could not abandon her post.

Naval security forces arrived.  They searched Sigsbee Park Annex, and approximately 30 minutes later they found the defendants still on the military installation.

Mr. Wang and Mr. Zhang were in possession of cellular telephones and also Mr. Zhang had a camera.

Consent was obtained by the security forces to review the devices and it showed that they had taken photographs of

military structures on Fleming Key, which I had just mentioned were sensitive facilities and homed the special operations facilities.

Each defendant made statements to law enforcement and they made statements after they waived their Miranda rights.

Now, their statements corroborated the material aspects of the charge here, the trespass charge, but they diverge in some important manners as well.  So I would like to highlight some of the differences and also some of the admissions in each statement.

So Mr. Wang reported that he arrived in Key West that morning with Mr. Zhang and that after sunrise he wanted to go to the Hemingway House but Mr. Zhang wanted to go to the small island, which was Sigsbee Annex, in order to take pictures.

Mr. Wang agreed to drive the pair there.

Mr. Wang claimed that when he first arrived at Sigsbee Annex, he thought the guard sentry was a toll booth for an island, but that after he arrived and was asked for military identification and he encountered a female that was wearing military clothing, he realized that it was a military facility.

Mr. Wang also said that when he couldn't provide any, that female directed him to make a U-turn.  He stated that Mr. Zhang told him that they could go anyway, to ignore the female who directed them to make the U-turn, and that he was uncomfortable doing so but that he decided to follow his

friend's request.  So he didn't make the U-turn but instead drove around the base.

He admitted that they drove around, that they parked and walked to a beach where they took photographs, that he saw his friend taking photographs with a camera, and that he was taking photographs himself with a cellular telephone.

He then provided consent to search his electronics and also to search a Homestead hotel room.  He had advised that they had stayed in the Homestead area the night before and that they left from there at approximately 4 that morning to drive to Key West.  And so he provided consent to search that room as well.

Those forms were available in English and Mandarin, but Mr. Wang stated that he understood English, and the agent had communicated the entirety of what I just described to you in English and Mr. Wang relied upon the English form and gave consent and stated he didn't need the available Mandarin translation.

So now I'd like to turn to the statement of Mr. Zhang, who was also advised of his Miranda rights, and then he was asked about how they wound up going to Sigsbee Park Annex.  He said it was a mutual plan that he developed with his friend Mr. Wang.  Again, that diverges from Mr. Wang's statement who said that he wanted to go to the Hemingway House and that the plan was Zhang's.

Zhang acknowledged that there was a female at the gate who asked for military identification, although he didn't expressly say whether that person was a military individual. He said he wasn't sure based on the uniform or something to that effect.  But the request was for a military identification.

He also confirmed that that person told him to make a U-turn, but he explained, he said that he didn't think he had to do it immediately.  He thought that he wasn't allowed to drive over double yellow lines, is what he explained to the FBI agents, and that's what was immediately after that guard sentry.

So he also said that he didn't discuss the propriety of doing that U-turn immediately with his friend.  Now, Mr. Wang's account is that he did have a little bit of a discussion and argument with his friend, that he told Zhang he was uncomfortable but that Zhang told him to proceed anyway. Zhang's account is they never even discussed it.

So they drove onto the post, which according to Zhang they did as well.  They drove around until they stopped.  They parked the vehicle.  They got out.  They took photographs with his camera -- he admitted that -- and videos.  There was also videos with the cellular telephone.

I will briefly just note it is difficult to reconcile his referencing that there is a double yellow line with parking

and getting out of the car because if the concern is immediately there is a double yellow line, I can't make a U-turn, that is not reconciled, and Mr. Zhang had no explanation for why once he was able to park he didn't accomplish the U-turn that he admits he was ordered to make.

It also can't be reconciled with taking 30 minutes, which is how long it took for security forces to find them, for him to ultimately be escorted off the facility by the security forces.

Mr. Zhang provided consent to search electronics in that same hotel room I referenced, and he also admitted that he had a laptop there that can be searched as well.  The forms were also offered to him in Mandarin, but he stated that he didn't need the translated form and agreed to sign them.

That conversation that I just described to you was completed in English and Mr. Zhang was comprehended by and was comprehensible to the agent.

It should be noted that when Mr. Wang was interviewed the agents didn't have a translated form for Miranda nor did Mr. Wang ask for one.  But by the time Mr. Zhang was interviewed they did have that form and Mr. Zhang said he didn't need the Mandarin translation; he was comfortable with the English advisement.

That concludes the government's proffer.

THE COURT:  Were you able to determine whether any of

the photographs or videos that were taken were sent on anywhere else?

MR. KOBRINSKI:  Your Honor, I think we can put that to the agent.  My understanding is that the forensic review is ongoing.

THE COURT:  OK.

MR. KOBRINSKI:  I'm not familiar with whether they've been sent on, but I do know that they were taken of the facilities.

THE COURT:  OK.  All right.  I assume that the lawyers would like to cross-examine the agent.

MR. MICHELEN:  Yes, your Honor, please.

THE COURT:  All right.

JAMES CHRISTOPHER KLETTHEIMER,

    called as a witness,

    having been duly sworn, testified as follows:

THE COURT:  Please state your full name for the record and spell your last name.

THE DEPUTY CLERK:  James Christopher Klettheimer. K-L-E-T-T-H-E-I-M-E-R.

THE COURT:  All right.  Did you hear the government's proffer in support of pretrial detention in this case?

THE WITNESS:  Yes, your Honor.

THE COURT:  And are you willing to adopt that proffer as your direct testimony?

THE WITNESS:  Yes, your Honor.

THE COURT:  Any changes in the proffer that you wish to make?

THE WITNESS:  No, your Honor.

THE COURT:  Do you have the answer to my question?  Do you know if they sent those pictures anywhere or had the opportunity to do that yet?

THE WITNESS:  The forensic exam is ongoing and that has not been determined at this time.

THE COURT:  OK.  All right.

Mr. Michelen, you may cross.

MR. MICHELEN:  Your Honor, thank you.  If it is OK if I stand at this podium because I would like to show the agents some images on the ELMO.

THE COURT:  So I guess I need to come down and look at it, is that what you are saying?

MR. MICHELEN:  I would like to project them here. That way it should show up on your screen.

THE COURT:  OK.  OK.  Great.

MR. MICHELEN:  I'm hoping.

Do you see my hand?

THE COURT:  I don't see anything.  I have a blank screen.  Well, I think there -- well, I don't know.  There is nothing on my screen.

THE DEPUTY CLERK:  It should be on.

MR. MICHELEN:  It does appear to be on here because I can see my hand on that screen, in there.

(Pause)

THE DEPUTY CLERK:  It is showing a signal, Judge.  I'm not sure, Judge, how to turn this thing on.

THE COURT:  All right.  Give me a minute.  I'll just have to get down from the bench, I guess.

It's saying no signal.

THE DEPUTY CLERK:  No signal.  The lamp is on.

MR. MICHELEN:  I only have one copy.

THE COURT:  All right.  I will be there in a minute.

MR. MICHELEN:  Or if we can make quick photocopies.

THE COURT:  No.  Well --

MR. MICHELEN:  There's only --

THE COURT:  Why don't we do that.  Christine, just make some photocopies.

MR. KOBRINSKI:  Your Honor, if Mr. Michelen has --

THE COURT:  In the future -- I know you're not down here a lot -- I wouldn't rely on technology in anything in this courtroom.  At least not when I'm here because I'm not used to anything other than the video conferencing, and that's not your fault.

MR. KOBRINSKI:  Your Honor, if Mr. Michelen has the documents electronically, I would request that he send them to me because I don't have the documents that he's referring to

either.

(Pause)

MR. KOBRINSKI:  I'm sorry, your Honor.  Did you hear what I just requested, or no?

(Pause)

MR. MICHELEN:  Your Honor, may I proceed?

THE COURT:  Yes.

MR. MICHELEN:  Thank you, Judge.

THE COURT:  Do you want to give -- make sure those exhibits are marked because now they're going to be part of the record.

MR. MICHELEN:  I am going to mark them as I introduce them, your Honor.  I'll hand the agent the original, your Honor, and then I'll give us --

MR. KOBRINSKI:  Your Honor, may I see the documents before they're handed to the agent?

THE COURT:  You know, this is why we can't do these at these things.  If you're going to do exhibits, you have to figure out -- now we have to send them to the government.  How would you like to do that?

MR. MICHELEN:  Your Honor, I can have, send them, the pictures through text messages to the prosecutor.

THE COURT:  Do you have your cell phone and is it working?  If not, we are going to move ahead without exhibits.

MR. KOBRINSKI:  I have my cell phone and it's working,

your Honor, yes.

MR. MICHELEN:  I'm sending them right now, your Honor.

THE COURT:  All right.

MR. KOBRINSKI:  I believe you only have my office number.

THE COURT:  Let me see these pictures.

MR. MICHELEN:  They're Google mapping, your Honor. The color versions are best.

If the government gives me their cell phone.

THE COURT:  He said all he's got is his office phone.

MR. KOBRINSKI:  No.  I'm sorry.  I have my cell phone. I just believe that Mr. Michelen only has my office number because it forwards to my cell.  But I'm --

THE COURT:  Do you want your cell phone number on the record?

MR. KOBRINSKI:  I prefer not to.

MR. MICHELEN:  Well, the government does have my cell phone.  He can just send me a text.

THE COURT:  All right.  You know how to do that?

MR. KOBRINSKI:  I've got it.

MR. MICHELEN:  Your Honor, I apologize.  I had e-mailed ahead to make sure --

THE COURT:  Even if it was, when we do a video conference exhibits are very difficult, and I know you didn't necessarily think about that.  It's just been a day full of

this sort of stuff.

MR. MICHELEN:  I understand, your Honor.

(Pause)

MR. KOBRINSKI:  I sent the message, your Honor.

(Pause)

MR. MICHELEN:  Your Honor, I sent seven images, your Honor, to the government.  Just to make it easy for the government and for everyone, I'm going to just go through them in the same order I sent them and in the same order that your Honor has the package.

THE COURT:  OK.

MR. MICHELEN:  Should I proceed?

THE COURT:  We are going to wait until we know the government's gotten it.

MR. KOBRINSKI:  At this point I have received two messages, two images.

THE COURT:  All right.  We are going to wait until you get them all.

(Pause)

THE COURT:  And are you going to number these 1 through 7?

MR. MICHELEN:  Yes, I was going to.

THE COURT:  Be aware, while we are waiting for this, that we are here on risk of flight.  So I'm not going to try this case right now.

MR. MICHELEN:  I understand, your Honor.  I understand.

MR. KOBRINSKI:  Your Honor, at this point I've received four.

THE COURT:  All right.  Do you have any objection to him starting with the first four and hopefully you will have the rest by the time he gets to them?

MR. KOBRINSKI:  That's fine, your Honor.  The only request I have is, because what he sent isn't marked with a number, if he would just describe it because I'm not positive I have the first four as opposed to the last four.

THE COURT:  Me either, so he has to do it for me as well.

MR. MICHELEN:  I understand.

MR. KOBRINSKI:  Thank you, your Honor.

MR. MICHELEN:  No objection.

MR. KOBRINSKI:  Thank you, your Honor.

MR. MICHELEN:  Your Honor, I will do that and I'm going to address them in order as well, but I will also describe the images.

May I?

THE COURT:  Yes.

Go ahead.

MR. MICHELEN:  Thank you, Judge.

CROSS-EXAMINATION

BY MR. MICHELEN:

Q.   Agent, now we can start.  I just want to confirm, you were not at the checkpoint when Mr. Zhang and Mr. Wang approached in the vehicle.

A.   No, I was not.

Q.   And at what point did you get involved in the case?

A.   I received a phone call approximately between 10 and 10:15 in the morning from one of the captains of the Key West Police Department.

Q.   And at that point they were already in custody, right?

A.   They were detained.

Q.   And even though you weren't at the checkpoint, you've been to this Dredgers Key before, right?

A.   Yes, that's correct.

Q.   And you've been to that checkpoint, right?

A.   Yes.

Q.   So you know what it looks like?

A.   Yes.

     MR. MICHELEN:  So at this point I will show the agent what I have marked here as Defendants' Exhibit 1, which is, should be the first image that the government has.  It is just an overview Google Map image of Dredgers Key and that area and the road leading up to it.

BY MR. MICHELEN:

Q.   Agent --

THE COURT:   Does it say Salt Pond Keys over on the right-hand side?

MR. MICHELEN:   Yes, it says Salt Pond Key over on the right, your Honor.

THE COURT:   All right.   Go ahead.

BY MR. MICHELEN:

Q.   Agent, do you recognize what I'm showing you?

A.   Yes, I do.

Q.   And what do you recognize that to be?

A.   Dredgers Key or Naval Air Station U.S., Sigsbee Annex.

Q.   Specifically, the strip of land, we'll call it the land bridge that joins Key West proper with Dredgers Key, do you see that there?

A.   Yes.

Q.   And is that the only way to go in and out of Dredgers Key via land?

A.   Yes.

Q.   And is that where the checkpoint is?

A.   Yes.

Q.   And does that image fairly and accurately depict the general layout of the land bridge and Dredgers Key as it relates to Key West itself?

A.   Yes.

MR. MICHELEN:   Your Honor, at this point I would like

to introduce that as Defendants' Exhibit No. 1.

THE COURT:  Any objection?

MR. KOBRINSKI:  No objection.

THE COURT:  1 will be received.

(Defendant's Exhibit 1 received in evidence)

BY MR. MICHELEN:

Q.  Agent, if you keep looking at the image, do you see there where the checkpoint would be?

A.  It's the -- yes, I believe so.  Yes.

Q.  And is it, in terms of when we describe the Google Map image, is it -- I will let you do it in your own words.  Can you describe where the checkpoint is.

A.  It is where you see the baseball fields and the cross-section between Roosevelt and Sigsbee Road.  As you would turn off of Roosevelt onto Sigsbee Road, it is a short distance down where the control point is.

Q.  And in terms of the map you're looking at, there's a small white circle kind of jutting out of a bridge.  Would it be fair to say that's the area where the checkpoint is?

A.  That's an approximation.  Without a closer view I wouldn't be able to say for sure, but an approximation, yes.

MR. MICHELEN:  So, your Honor, at this point I will show the agent what's been marked as Defendants' Exhibit 2, which is a closer view.

Q.  Agent, please take a look at that.

MR. MICHELEN:  And for the record, it is an aerial image that shows buildings to the right and shows a circle structure on the top middle of the page and it's basically just a zoom-in version of Defense Exhibit 1.

THE COURT:  OK.

BY MR. MICHELEN:

Q.  Agent, do you recognize that image?

A.  Yes.

Q.  And do you see the checkpoint there?

A.  Yes.  I see what I believe to be the checkpoint, yes.

Q.  And does that image -- does that map in terms of the general layout and the structures and the buildings surrounding it, does that fairly and accurately depict the way that the layout was on January 4th, in terms of just generally the building, the roads, things like that?

A.  From an overhead view I wouldn't be able to say for sure because I'm always looking at it from a street level, but that is the approximation locate of where the entry control point is.

Q.  So if you look, agent, at that image, you see the structures to the right.  There are one, two, three, four, five, six, seven, eight main structures to the right.

Do you see that?  It is off of, I guess, Roosevelt Ave, the intersection.  Do you see that?

A.  Can you point to what you are referring to?

Q. These structures right here.

A. Yes.

Q. And do you see there what --

MR. MICHELEN: And in the black-and-white image, your Honor -- you may not be able to tell --

Q. But, agent, do you see there what appears to be a pool, for example?

A. Yes.

Q. Within those images?

A. Yes.

Q. And it's kind of off of the marina?

A. Yes.

Q. And that area right there is a resort, right?

A. Correct.

Q. And in fact, you could rent jet skis off that resort, right?

A. Yes, I believe so.

Q. Civilians can rent jet skis and ride them around in the water right there, right?

A. I believe you can. I don't know the specifics of what you can and can't do.

Q. Agent, opposite that structure, across the road, you see two buildings. Can you see those?

A. Yes.

Q. That's a Marriott Courtyard, right?

A.   Correct.

Q.   And that's open to civilians; they can stay there as well, right?

A.   Yes.

Q.   Agent, you've been through this checkpoint before, right?

A.   Yes.

Q.   And is the checkpoint manned at all times?

A.   I wouldn't be able to answer that question.  The times that I have been through there it has been manned.

Q.   And as far as you're aware, and perhaps even based on your version in this case, is there a video camera at the checkpoint?

A.   I do not know.

Q.   Do you know -- have you inquired about whether in this case interactions with people that approach the gate, is that recorded from the checkpoint?

A.   The investigation is still ongoing.

Q.   But at this point do you know the answer to that?

A.   No.

Q.   How about audio, do you know if there's audio recordings of interactions between people who approach the checkpoint and the master at arms?

A.   No.

Q.   You don't know?

A.   No.

Q.   I'm just trying to understand.  They are not recorded or you don't know if they are?

A.   I do not know.

Q.   OK.  Agent, to be clear, is it your position that only military personnel can enter Dredgers Key?

A.   It's my understanding you have to have military identification to enter Sigsbee Annex Naval Air Station Key West.

Q.   I understand that that's the policy.  And you may not know the answer to my question, but as far as you're aware, can civilians ever access Dredgers Key?

A.   I don't know the policies of naval air station Key West.

Q.   OK.  So can civilians access Dredgers Key?

A.   I don't know the answer to that question.

Q.   OK.

          MR. MICHELEN:  Your Honor, at this point I'm going to show the agent what's been marked as Defendants' Exhibit No. 3.  I will describe it as just the third aerial view of the land bridge that connects Key West proper, starting at Roosevelt Ave, all the way to Dredgers Key.  It should be the third document that your Honor has and that the government has.

BY MR. MICHELEN:

Q.   Agent, I'm showing you a third Google Map image.  Do you recognize this image?

A.   Yes.

Q.   Is it fair to say it's just another aerial view of the same area?

A.   Yes.

Q.   And it fairly and accurately depicts the general layout of that area?

A.   Yes.

Q.   And you can see the land bridge that connects Key West proper with Dredgers Key, right?

A.   Yes.

Q.   And the proffer that you adopted says that the master at arms told Mr. Zhang and Mr. Wang to make a U-turn out of the outside of checkpoint out of the land bridge, is that right?

A.   Yes.   They were instructed to make a U-turn just past the entry control point.

Q.   And as was mentioned in the proffer -- I just want to confirm -- the land bridge is a two-way road, right?

A.   It is a two-way road, but the outbound lane also has a bicycle lane that I would describe as extra wide.

Q.   OK.   Outbound lane?

A.   Correct.

Q.   And between the inbound lane and the outbound lane, it's not divided by any physical structure, right?

A.   Can you repeat the question?

Q.   There is --

          THE COURT:   There is no median.

Q.   There is no median?

A.   Not that I recall.

Q.   As the government stated, it is a double yellow line, right?

A.   Correct.

Q.   And the master at arms told Mr. Wang and Mr. Zhang to make a U-turn and leave the land bridge, right?

A.   Yes.  They were to make a U-turn just past the entry control point.

Q.   And instead, according to the proffer that you adopted, the allegation is that they ignored that command and instead just drove all the way down the land bridge, right?

A.   Correct.

Q.   And the master at arms noticed, hey, these two guys did not turn away, did not turn around, right?

A.   Yes.

Q.   And at that point she radioed who?

A.   Navy security forces.

Q.   And that's a radio not like a -- it wasn't a phone call, it was a radio, like a walkie-talkie, right?

A.   Yes, that's my understanding.

Q.   And as far as you're aware, communication inside -- communication from those radios, is it documented anywhere?

A.   Yes.

Q.   Where is that documented?

A.   That we are retrieving that document from Navy security.

Q.   And will there be a document that also shows the moment when Mr. Wang and Mr. Zhang approached the checkpoint?

A.   That I do not know.

MR. MICHELEN:  And, your Honor, I would now move to introduce Defendants' Exhibit No. 3 if I haven't done so.

THE COURT:  You didn't move in 2 either.  Do you want that one in?

MR. MICHELEN:  Yes, please, your Honor.

THE COURT:  Any objection to 2 and 3?

MR. KOBRINSKI:  No, your Honor.

THE COURT:  2 and 3 are received.

(Defendant's Exhibits 2 and 3 received in evidence)

BY MR. MICHELEN:

Q.   Agent, I'm now going to show you what has been marked as Defense Exhibit 4.  It is the same exact image that I just showed you except this time there is a measurement of the distance between the checkpoint and Dredgers Key itself.  It is an approximation.  According to Google, it's 684 meters, which is almost half a mile.

Does that sound about right?

A.   Yes.

MR. MICHELEN:  Your Honor, I would move to introduce Defendants' Exhibit No. 4 into evidence.

THE COURT:  Any objection?

MR. KOBRINSKI:  Your Honor, I just don't believe I have that exhibit.  I'm looking -- the only one I see that has a measurement, which has the length being 1,325 --

MR. MICHELEN:  It should be the one right before that.

THE COURT:  Yes.  That was No. 5.

MR. KOBRINSKI:  Well, it came out of order, your Honor.  What he referred to as No. 2 was No. 3 for me.  So I'm trying to scroll through and look, but I might have got some duplicates, but I don't have that one.

THE COURT:  They're essentially, the first four are all the same.

MR. KOBRINSKI:  No objection, your Honor.

THE COURT:  So let's take that one, and 5 is different.  So we'll look at --

MR. KOBRINSKI:  No objection.

THE COURT:  They're just different views or different zooming-in values of the same thing for the first four.

BY MR. MICHELEN:

Q.  Agent, if you could just look at another aerial view, for example, Defense Exhibit No. 1 which has kind of an aerial view of Dredgers Key.

As far as you're aware, do you know the route that -- well, let me back up.

As far as you're aware, was there any military police, Navy police, any kind of officer or law enforcement or anyone

waiting for Mr. Wang and Mr. Zhang at the end of the land bridge at the moment they are about to drive onto Dredgers Key?

A.   No.   There was another Navy security forces officer on Sigsbee Annex that was involved in another call when the radio call went out that they had breached the gate.

Q.   And to be clear, in the proffer it's not clear and now the terminology of they breached the gate.   This is a checkpoint with a gate or like an arm, right, that raises up and down? Right?

A.   I don't recall if there is an arm there or not.

Q.   Are you saying it may just be completely open?

A.   It is manned with a Navy security forces person checking IDs.

Q.   Is there some kind of structure, fence, bar, stick, arm, anything that needs to be opened before a car can go through?

A.   At the time I was there there was no stop arm that I observed.

Q.   Have you been there for this case?

A.   Yes.

Q.   And there was no stop arm?

A.   Not that I observed.

Q.   Nothing that needs to be raised?

A.   Not that I observed at the time I was there.

Q.   And this is a -- as far as you're aware, has there been any renovation or anything like that in the last few days?

A.   No, I would have no knowledge of that.

Q.   So this is, again, a military facility, right?

A.   Yes.

Q.   Restricted area, right?

A.   Yes.

Q.   Where possibly only military ID'd individuals can go into, right?

A.   Yes.

Q.   And there is no physical structure preventing anyone from driving onto Dredgers Key?

A.   There's no arm that I recall.

Q.   Is there any physical structure that prevents someone from just driving onto Dredgers Key?

A.   No.

Q.   And back to the other question about where -- why there wasn't anyone waiting for Mr. Wang and Mr. Zhang in response to the master at arms' radio call at the end of the land bridge.

A.   Your question again, please.

Q.   Why was there no one waiting for them to intercept them to say, hey, you can't come in?

A.   There was a Navy security forces officer on duty on Sigsbee Annex and at the time the call went out over the radio that they had continued on past the gate, as they were instructed not to, that officer was involved in another call at that time.

Q.   So what gate?

A.   I'm sorry.  I don't understand your question.

Q.   You said they continued on past the gate.

A.   Yes, the entry control point.

Q.   But is there a gate there?

A.   I would consider that an entry control point.  Maybe --
it's an entry control point.

Q.   OK.  When did the call go out?

A.   I have not seen the call log yet.

Q.   By the time that Mr. Wang and Mr. Zhang reached the end of
the land bridge that connects to Dredgers Key --

          THE COURT:  What?  If you turn away and you don't
speak in the mic, you're not going to have much of a record.

          MR. MICHELEN:  I apologize, your Honor.

BY MR. MICHELEN:

Q.   Agent, looking again at, for example, Exhibit -- the one
you're looking at, Exhibit No. 1, agent, at the time, at the
moment where Mr. Wang and Mr. Zhang in the vehicle they're in
reach the end of the land bridge that connects to Dredgers Key,
had the call gone out?

A.   I don't know the answer to that question.  It's my
understanding that after they left the entry control point the
call went out right away.

Q.   And there was only one other person that could have stopped
them and it was someone who was busy on another call?

          MR. KOBRINSKI:  Objection, your Honor.  Calls for

speculation.

BY MR. MICHELEN:

Q. Was there anyone else --

THE COURT: Well, I think that's what he said, the person was on another call.

Mr. Michelen, if your goal is to show me that the security procedures here were lax, at the very most generous, and foolish, you've succeeded. But let's move along here.

MR. MICHELEN: Yes, your Honor.

BY MR. MICHELEN:

Q. So, agent, again just looking at Exhibit No. 1, which shows an aerial view of Dredgers Key, do you know today after your investigation the route that Mr. Wang and Mr. Zhang in their vehicle took once they entered Dredgers Key itself?

A. I do not know the route. I know where the photographs were taken from.

Q. OK. So how many photographs were taken? For example, let's start with Mr. Wang. How many photographs were taken from Mr. Wang's phone?

A. I observed four. He indicated that he had taken a total of seven.

Q. And where were those photos taken?

A. From the RV park at one of the furthest points that gives you open access to also take pictures of Fleming Key.

Q. So can you point out where.

A.  Right here.

MR. MICHELEN:  Just for the record, your Honor, the agent is pointing at -- it's hard to see on the black and white, Judge -- basically the opposite end -- basically the end of, the end of Dredgers Key that is opposite the land bridge. So just directly opposite the land bridge.

BY MR. MICHELEN:

Q.  Is that where, agent?

A.  Yes, that would be fair.

THE COURT:  OK.

BY MR. MICHELEN:

Q.  So there is an RV park there?

A.  Yes.  More closely, if you see the baseball field, it's between the baseball field and the shoreline.

Q.  And is there a beach there too?

A.  I would call it a shoreline, not necessarily a beach.

Q.  And there are RVs parked there?

A.  Yes.

Q.  People park there?

A.  Yes.

Q.  On vacation?

A.  There are RVs parked there, yes.  I would assume on vacation.

Q.  OK.  And you said the images are of -- they're facing which direction, the pictures?

A.   There are images of Dredgers Key or Sigsbee Annex and then also --

Q.   Who are you referring to?

A.   Mr. Wang.

Q.   Mr. Wang, the pictures you said -- there were four pictures taken that you saw on his iPhone?

A.   Right.

Q.   Was it an iPhone?

A.   I don't recall the model of the phone.

Q.   On his phone there were four pictures that you saw?

A.   Yes.

Q.   And were they all taken from that same general area of the RV park?

A.   They appeared to be, yes.

Q.   And what were the pictures of?

A.   The four pictures that were on the phone were of the shoreline.  It was described to be by the Navy security forces that when they initially encountered Mr. Wang they reviewed all the photos taken on Sigsbee Annex and there were some additional photos that were not present when we looked that were also key.

Q.   They were also, I'm sorry, what?

A.   Fleming Key.  Of the military structures on Fleming Key.

Q.   OK.  So in total, how many images are we talking about from Mr. Wang's phone?

A.  Seven, I believe.

Q.  And have you seen all of them?

A.  No, because the forensic exam is ongoing.

Q.  Did you bring any of them?

A.  No.

Q.  So the ones you did see, you saw four, right?

A.  Yes.

Q.  And I want to just kind of break it down.  They depict water?

A.  Shoreline.

Q.  What do you call the shoreline?

MR. KOBRINSKI:  Your Honor, at this point I'm objecting to beyond the scope of this hearing.

THE COURT:  Well, I just don't want to be here until next week.

MR. MICHELEN:  I'll speed it up, your Honor.

BY MR. MICHELEN:

Q.  Agent, is it fair to say the images depict water, sky, and in the background Fleming Key?

A.  Yes.

Q.  And I'm going to show you another image which has been marked Defense Exhibit 5.  This is the one the government was referring which shows the distance between Fleming Key and Dredgers Key.

Agent, you see that on -- I've marked a point on

Dredgers Key and -- using Google Earth -- and I've measured the distance between that and the closest point of Fleming Key, right?

A.   It appears to be, yes.

Q.   And in fact, the point I labeled is closer to Fleming Key than where you've told us the pictures were actually taken, right?

A.   Correct.

Q.   And the distance, according to Google Earth, from the point I labeled, which is closer, to Fleming Key is 1,325 meters, which is approximately .8 miles.  So almost a mile, right?

A.   Yes.

        MR. KOBRINSKI:  Your Honor, there is no foundation for -- I'm sorry.  Objection on foundation of these exhibits that Mr. Michelen is testifying about.

        MR. MICHELEN:  Well, the agent just agreed.

        THE COURT:  Well, you didn't give him a chance to -- don't do that to me.  If the agent knows, he can.  But we don't have any basis as to how you computed the distance.

        Agent, is that your understanding, that it is somewhere around 8/10ths of a mile, if you know, because we are not going to get into authenticating Google Maps?

        THE WITNESS:  I do not know the distance from Dredgers Key to Fleming Key.

        THE COURT:  Where did that figure come from,

Mr. Michelen?

MR. MICHELEN:  Your Honor, that came from Google Earth.

THE COURT:  All right.  So we'll say that Google Earth says that's the distance.  We don't know if that's accurate, but that is what it is.

MR. MICHELEN:  Noted, your Honor.  Noted.

THE COURT:  It is going to make zero difference anyway I would imagine.

BY MR. MICHELEN:

Q.  Agent, what kind of camera -- it was one camera that was found, right?

A.  Correct.

Q.  It was a Nikon?

A.  I believe so, yes.

Q.  What kind of Nikon was it, do you know?

A.  I do not recall the model number.

Q.  Do you know the lens capacity for that camera?

A.  I do not know.

Q.  Did you see on Mr. Wang's phone -- you said you saw four pictures and then the agents, the other officers found an additional three.  Were those the only pictures on his phone?

A.  No, there were other pictures on the phone.

Q.  Do you have any idea how many there were?

A.  No.

Q.  Was it, based on what you saw, was it a few more pictures, hundreds of pictures on the phone?  Do you have any idea how many pictures?

A.  I do not.

Q.  Did you see any other pictures aside from the four you saw?

A.  Yes.

Q.  What were those pictures of?

A.  Various things.  School, places.

Q.  Other places where he was?

A.  Yes, I believe so.

Q.  Agent, speaking generally, are you aware of other similar situations where people have gotten in trouble for getting too close, for example -- sorry.

MR. KOBRINSKI:  I'm going to object, but I thought the question was -- sorry for interrupting.

BY MR. MICHELEN:

Q.  Agent, are you --

MR. MICHELEN:  Is there an objection?

THE COURT:  Yes, there is, and it's sustained.

We're just getting so far afield.  Yes, I sit in these cases.  I understand that boats get tickets for being too close to Fleming Key.  I can take judicial notice of that.  Let's move on.

BY MR. MICHELEN:

Q.  Agent, were you the agent that interviewed Mr. Wang?

A.   Yes, I was one of the agents.

Q.   You were one of the agents?

A.   Yes.

Q.   How many times was he interviewed?

A.   We interviewed him one time.

Q.   Do you know if anyone else interviewed him?

A.   I know that Navy security forces and Key West PD spoke to him as well.

Q.   When you spoke to him, were you the first, the third, the second?  What order were you in terms of when you interviewed him?

A.   We spoke to Mr. Wang after Navy security forces in Key West PD, who were on scene together, spoke to him.

Q.   And when, more or less, did you speak to him?

A.   It was sometime -- I don't recall the exact time.  I know once we got the phone call shortly after 10:00 we made our way to Key West as quickly as we could.

Q.   And where was this interview done?

A.   In Monroe County Detention Center.

Q.   And was it recorded?

A.   No.

Q.   And you're part of the FBI, right?

A.   Yes.

Q.   And you're aware of the 2014 DOJ policy that says that you're supposed to record every interview, right?

A.   Yes.

Q.   Agent, you ran background checks on Mr. Wang?  Did you run a background check on him?

MR. KOBRINSKI:  Objection.  Relevance.  We have a Pretrial Services report and it's beyond the scope of the proffer.

MR. MICHELEN:  I'll change the question, your Honor, and this will be my last question, I'm pretty sure.

BY MR. MICHELEN:

Q.   Agent, as far as you're aware, when you investigated or ran any kind of check on Mr. Wang, did you find any -- did you get any suspicion -- did you find any evidence that he's traveled maybe using, maybe by seeing his driver's license or any kind of record, any evidence that he's traveled to other areas in the country where there are restricted military areas; any kind of pattern like that did you find that?

A.   No.

MR. MICHELEN:  Your Honor, I have no further questions.

Thank you, agent.

THE COURT:  All right.  Counsel, Mr. Flores, you may cross.

MR. FLORES:  Your Honor, Mr. Michelen has covered all the areas that I was interested in going to.  So I will have no questions.

THE COURT:  OK.

MR. KOBRINSKI:  May I briefly redirect?

THE COURT:  Yes, you may.

REDIRECT EXAMINATION

BY MR. KOBRINSKI:

Q.  Just with respect to the photos that were recovered, you testified more extensively about Mr. Wang who Mr. Michelen is representing.

With respect to Mr. Zhang, did you personally observe photographs of military facilities on Mr. Zhang's camera?

A.  Yes.

Q.  OK.  Did either Mr. Wang or Mr. Zhang have permission of the base commander to bring electronic equipment to Sigsbee Annex on that day?

A.  They did not have permission to be on the property.

Q.  And then does that include permission to carry electronics with them?

A.  Yes.

Q.  Did they have permission to take photographs of military installations on that day?

A.  No.

MR. KOBRINSKI:  That's it, your Honor.  Thank you.

THE COURT:  Agent, I presume that your testimony regarding the width of the bike lane was for the purpose of making clear that there was plenty of room to make a U-turn.

THE WITNESS: Yes, your Honor.

THE COURT: And is that true, was there plenty of room to make a U-turn?

THE WITNESS: Yes, your Honor.

THE COURT: Did either of the defendants say that there were vehicles coming in the other direction which caused the concern about the double yellow line?

THE WITNESS: No.

THE COURT: All right. Any further evidence from the government?

MR. KOBRINSKI: No, your Honor.

THE COURT: Any evidence, testimony or proffer on behalf of Mr. Wang?

MR. MICHELEN: No, your Honor.

THE COURT: Any evidence, testimony or proffer on behalf of Mr. Zhang?

MR. FLORES: No, your Honor.

THE COURT: OK. All right.

Any argument from the government?

MR. KOBRINSKI: Your Honor, I don't want to belabor the point. Their post-Miranda statements both admit to a trespass offense. Mr. Wang more directly because Mr. Wang says he understood the master at arms to tell him not to proceed, but he decided to listen to his friend who was directing him.

Mr. Zhang, though, while slightly more cagey, also

shows a disregard. He was told to make a U-turn. It didn't have to be immediately, plus there was a double yellow line, yet 30 minutes later he's still on the installation and he's taking photographs of the installation. So there are a couple of different excuses that he's throwing out there trying to see what sticks.

Aside from those circumstances which relate to this being among the more aggravating of the trespass offenses that this court likely has seen, because we have people who are prevaricating and not being clear of their intentions, and it's clear beyond just their actions, the fact that they have different statements that aren't reconcilable about who directed them there and why, that shows that this is more aggravating.

Also, while they're trespassing on the installation, the photographs they take happen to be of a very sensitive installation.

I get that Mr. Michelen has offered in exhibits that there are photographs and other trespassers that take place. The other trespassers that he's referenced in his exhibits, there is no evidence that they have taken photographs or that they're foreign nationals, which goes to the idea of their being a flight risk in the instant matter.

Here, as the court noted in a recent case, this is as serious as a misdemeanor can get. In the most recent

sentencing in Key West, the judge gave the statutory maximum for the offense. So there is a significant incentive to flee.

These individuals know or have ICE detainers, and their ties to the community are scant.

THE COURT: That was my question. Have their visas been revoked?

MR. KOBRINSKI: I actually think the visa, which is handled by the State Department, is in the process -- it's an in-between stage. I think they've been revoked, but I think the kind of revocation that's taken place is once they leave the country, they're no longer allowed to return.

It's not a full revocation as it was in the last matter. However, there is an ICE detainer in this case, which goes to the idea that they don't have other ties to this besides that student visa, they don't have other ties to this community particularly, and that the ties they do have to this country are scant.

It is the master's program, which I don't want to minimize because obviously I do believe there's evidence that they were in fact in that master's program, but those ties don't compare to the significant incentive of a potentially lengthy sentence when it comes to the idea of whether or not they pose a risk of flight.

So I think in light of the deception in their statements, in light of their conduct, which is aggravating in

terms of the circumstances of the offense, and that's what the offense charged here is.  It is trespass for the purpose of photography.  So the fact that there are Google images of this same area doesn't excuse them taking matters into their own hands and allow them to photograph that facility, which I believe is going to be some of the crux or thrust of Mr. Michelen's argument.

These are pictures that exist.  That doesn't allow them to decide to do that.  They didn't have permission.  There was a road they drove down that was signed and the signage indicated no photography and indicated no trespassing.

So in light of all those circumstances the government would request respectfully that this court hold them in pretrial detention.

THE COURT:  All right.  Mr. Michelen, any argument?

MR. MICHELEN:  Your Honor, just quickly, I want to point out, your Honor, things are not always what they seem, Judge, and I understand why this could be a salacious case. But if we look, Judge, at the crux of the government's allegations, which is that Mr. Wang and Mr. Zhang were given clear instructions to not do something and they did it anyway, if we look at that and then we look at what we have learned today and the evidence we do see, we have to ask whether or not that is actually corroborated by not just Mr. Wang and Mr. Zhang's actions that day but everyone else's actions that

day.

So I can appreciate, Judge, your Honor noting that the security is lax at best and deficient, but that is not the only point that your Honor can draw from that.

Half a mile is a distance from the checkpoint to the end of the land bridge.  We're not even sure when the call was made.  We're not even sure who was notified of that.  And if this was such a breach, it is very difficult to understand and wrap your mind around the idea that if these two kids breached security to such an extent while half a mile away, there wouldn't be cars stopping them.

THE COURT:  It boggles the mind.

MR. MICHELEN:  It boggles the mind --

THE COURT:  But I don't think it indicates that this was not a serious matter.

MR. MICHELEN:  That's not what I'm saying, your Honor. What I'm saying is there is the question of whether it was just hardly deficient security or whether there just simply was no call made by the time they got there because this wasn't the way things transpired.

How does someone who has been supposedly told not to go in and they miss the U-turn immediately, right, according to the government, how does it take 30 minutes?  The only way, your Honor, is if no one was looking for them for 30 minutes, because it takes half a mile to even get onto Dredgers Key.

Then you have to park --

THE COURT:  If the guy is on another call, now they are on the key, now there are a lot of places for them to be and the guy is driving around looking for their car.

MR. MICHELEN:  Sure.

THE COURT:  Hopefully something will change because as an American citizen, and I'm not really fussing at the Navy because this is a new phenomenon, but I truly hope that they will do something so that they don't have somebody who can't leave her post -- they could have video'd everything and mailed it to the world by the time the security caught up with them. I'm horrified by that.

Go ahead, Mr. Michelen.

MR. MICHELEN:  Your Honor, that leads me to my next point, which is the agent isn't -- we're not even sure if in fact civilians cannot go onto Dredgers Key.  There is this idea that policy and protocol say that there is a military installation only with military ID, but --

THE COURT:  Well, I think there would have to be, for example, I might be permitted if the person in charge there gave some kind of special authorization.  I'm sure Joe -- they even had the agent clarify that, but Joe Blow on the street can't just say I'd like to go see this place or they wouldn't be asking for military ID.

MR. MICHELEN:  You may be right, your Honor, but as it

relates to this case in terms of Mr. Wang and Mr. Zhang, the question is whether they were aware of that, whether they actually understood, whether they were notified that they could not be on Dredgers Key.  When someone allows someone in and no one is stopping you, those are really nonexistent indications that you're not supposed to be there.

Judge --

THE COURT:  Well, they spoke English well enough to attend the University of Michigan and understand the agents.  So if you want me to say she didn't tell them, fine, that she didn't tell them that they couldn't be there, that's a credibility question.  We don't have review.

MR. MICHELEN:  Your Honor, that's not exactly what I'm trying to get at.  We have this notion that they spoke fluent-enough English to understand any kind of instruction that was given to them, yet on a case like this, which I understand that it is a misdemeanor, but with the diplomatic implications of this case, for the FBI not to record so that we could actually hear and see if in fact what their language ability is, that boggles my mind, your Honor.

THE COURT:  I've never heard the FBI recording a confession, but that's just me in the last 40 some years.  There may be a policy.  If they're doing it, it's not something I've heard.

MR. MICHELEN:  Well, your Honor, there is a 2014

policy that does say every branch under the DOJ, which includes --

THE COURT:  And do they do it?

MR. MICHELEN:  -- which includes the FBI -- yes, they're supposed to and they've gotten in trouble when they don't.

THE COURT:  You've had recorded conversations from the feds introduced at trial?

MR. MICHELEN:  I've had DEA agents admit that they should have and they didn't, and admit that they stopped the recording when they weren't supposed to.  I've seen that.

But, Judge, just because they don't --

THE COURT:  Yes.  I mean, they've never done it.  I've been around for 45 years and they never do record it.

MR. MICHELEN:  But that takes us, your Honor, back to practice versus policy, whether the policy at the checkpoint is not to let civilians in but they let them in anyway.

THE COURT:  I'm not going to be shocked by that is what I'm telling you.

MR. MICHELEN:  Lastly, your Honor, the pictures, because the pictures allegedly show some kind of mal intent, because the government keeps reiterating, well, this is just trespass, but then it brings up the pictures as the unlawful purpose.  We could have easily seen some pictures, and we don't know if the degree to which any kind of military installations

are actually depicted, whether it is just a sunrise and then an island with general building structures in the background.

So, Judge, that is my argument in terms of PC.  The evidence is weak at best.

My second argument, your Honor, is I understand that there is as of this morning a detainer was placed on Mr. Wang. That being said, there's nothing preventing this court from setting a conditional bond on the condition that he ends up at some point getting an immigration bond.

I've been in communication with his family in China. I have been in communications with family friends that live here in the U.S. in California.  They are all extremely willing to support him and do whatever it takes.  One, to get him an immigration attorney that could hopefully fix this visa situation and lift this detainer, and, two, to provide this court with any kind of bond condition that would make your Honor feel more comfortable.

His family, his mom's childhood friend and her husband, Mr. Joseph Wong, live in California.  I've been in touch with them for the last two days.  They are very much willing, if that is what the court requires, to let him stay with them.  I understand that is in California, but they're not from South Florida.  And the family is in a position to find money to post bond if that is what the court requires.

Judge, this is a misdemeanor and I understand, because

of their nationality and diplomatic relations, I understand what the case looks like, but at the end of the day these are 24-year-old kids where, your Honor, the implications, the elephant in the room, they could just as easily be a normal kid, a normal American kid, and though everything -- the elephant in the room and everything overshadowing this case is this idea that they were sent here for some nefarious reason. We all know that if this was just a regular misdemeanor, there probably wouldn't be much of a question whether two 24-year-old college students with absolutely no record deserve some kind of bond if they are caught trespassing, wherever that may be.

THE COURT:  Well, it depends on the misdemeanor.

MR. MICHELEN:  Right.

THE COURT:  We've got a situation where there are no real ties we are talking about.

MR. MICHELEN:  Your Honor, that is our request, for the court to consider a conditional bond, and by that I mean if he is able to post an immigration bond, and the court would allow him to post a bond here where, of course, so long as probation were to approve any third-party cosigners or anything like that, that he be allowed to go back to will school, your Honor.  He's getting a master's degree.  School started back up on the 8th.

So, Judge, this is his entire life.  He came to the U.S. to study.  There's a lot for him to lose here, and we're

asking the court to just take that into consideration.

Thank you.

THE COURT:  Mr. Flores.

MR. FLORES:  Your Honor.

THE COURT:  You can stay where you are if you like.
Just make sure you speak into the mic.

MR. FLORES:  Yes, your Honor.  Judge, we'd adopt the
arguments made by Mr. Michelen, and we're in the same position.
We have a master's student in architecture at the University of
Michigan who just wants to go back to school.

In terms of risk of flight, his intent is to try his
best to get back to the University of Michigan.

The ICE detainer is an impediment to that, and I would
just request your Honor consider a bond that's reasonable under
the circumstances.

I have been in touch with the family in China and some
other people here in the U.S. and he is in a similar position
to Mr. Wang.

THE COURT:  All right.  As I said in connection with
the last defendant who was here on a detention hearing, it is
not my belief that either of these two defendants is an
undercover agent or a master spy or anything of that nature.

Alas, there is also no question in my mind that the
purpose of going onto the military base and defying orders and
not doing what was told and taking the pictures was for

purposes of obtaining information that was valuable to someone other than these two defendants.

The last defendant I believe that the court sentenced to the statutory maximum and departed above the guidelines, and I have no reason to believe that the same thing will happen to these defendants.

This is very troubling.  This is very serious.  I didn't write the statute.  I'm not sure that something other than a misdemeanor might be appropriate for this type of offense, which would perhaps cause people to exercise more restraint before doing it.

The bottom line is they have no ties to the United States.  There are ICE detainers.  I certainly am not at all sympathetic to wanting to go back to school in the United States under these circumstances, and they are flight risks. So detention will be ordered on both defendants.

All right.  Anything else to come before the court?

MR. KOBRINSKI:  Not from the government, your Honor. Thank you.

MR. MICHELEN:  No, your Honor.  Thank you.

(Adjourned)

C E R T I F I C A T E


    I hereby certify that the foregoing is an accurate

transcription to the best of my ability of the digital audio

recording in the above-entitled matter.


January 28, 2020          s/ Joanne Mancari
                          Joanne Mancari, RPR, CRR, CSR
                          Court Reporter
                          jemancari@gmail.com