UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO.  20-10005-CR-MOORE

UNITED STATES OF AMERICA,

       Plaintiff,

v.

YUHAO WANG,

       Defendant.

_____/

## SENTENCING MEMORANDUM

The origins of the principle known as "Occam's razor" can be traced as far back as Aristotle, who wrote, "Nature operates in the shortest way possible."[1] Ernst Mach, a 20th Century physicist and philosopher, perhaps stated the principle most succinctly, "Scientists must use the simplest means of arriving at their results and exclude everything not perceived by the senses."[2] Over the centuries, this principle has come to stand for the idea that the simplest solution is most likely the correct one.

Here, the evidence points to the simplest explanation for what happened on January 4, 2020: Yuhao Wang's ("Yuhao") entry onto Dredger's Key, although a criminal act, was simply a mistake and the result of naiveté and misunderstanding. Nevertheless, Yuhao does not make excuses, and he does

---

[1] *What is Occam's Razor?* http://math.ucr.edu/home/baez/physics/General/occam.html. Archived from the original on July 6, 2017.
[2] *Becher, Erich (1905). The Philosophical Views of Ernst Mach. The Philosophical Review.* **14** *(5):* *535–562.* https://www.jstor.org/stable/2177489?origin=crossref&seq=1#metadata_info_tab_contents

not feel sorry for himself. He knows he should have known better, and he accepts full responsibility.

Before deciding his fate, Yuhao respectfully requests this Court consider all aspects of his life—his entire body of work—his achievements and experiences, his contributions to his community and the sacrifices he has made and continues to make. He also asks that this Court consider the extraordinary circumstances surrounding the COVID-19 pandemic, and the need reduce the prison population. Yuhao is not a defendant that requires further incarceration:

1) He made a mistakes, a criminal one, but nothing suggests he is destined for a life of crime;

2) The numbers do not lie: Yuhao's criminal history, academic achievements, and extensive support system suggest that he is unlikely to recidivate;

3) A lengthy sentence, especially given the extraordinary circumstances surrounding the ongoing COVID-19 pandemic, would place him in unnecessary danger and would do more harm than good.

Yuhao understands that he must answer for his conduct, and that his actions have consequences. He respectfully asks this Court to sentence him to 6 months in jail—a longer sentence is not necessary to ensure just punishment and deter future criminal conduct.

**I.**   **Yuhao made a mistake, a criminal one, but nothing suggests he is destined for a life of crime.**

Yuhao is a 24-year-old Master's candidate at the University of Michigan College of Engineering. He is a native of Chongqing, China who was raised by his parents and grandparents with an immense amount of love and dedication. Due China's one-child policy, he is the only child born to Jixiang Zhou and Ting Chang Wang. His family taught him to be caring and honest with everyone that crossed his path. Above all, he was encouraged to excel at school and to value his education. Yuhao took these lessons to heart, and in August of 2018, after years of hard work and dedication, he earned his Bachelor degree in Electrical Engineering from Xi'an Jiaotong-Liverpool University.

Yuhao always intended to continue his education beyond a bachelor's degree. He wanted to pursue a Master's and eventually a PhD in electrical and computer engineering. Most importantly, he wanted to chase the American dream. With that in mind, beginning in January of 2018—and with the guidance of counselors and mentors from Xi'an Jiaotong-Liverpool University—he completed the lengthy and time-consuming process of applying to some of our most prestigious university. Ultimately, he was accepted into multiple Master's programs—University of Southern California, Northwestern University, and the University of Michigan. He chose the University of Michigan and arrived in Ann Arbor, Michigan weeks after his undergraduate graduation. The American dream was at his fingertips.

3

One of his roommates at the University of Michigan was Jielun Zhang—a fellow Chinese native who was also enrolled at the school. They did not know each other prior to arriving on campus—they met through a roommate-finder application prior to their arrival in Ann Arbor.

The pair eventually became friends and supported each other as they learned to adapt to their new surroundings. They also took a few road trips together to nearby destinations—once to Chicago and once to Detroit. In the fall of 2019, they toyed with the idea of travelling to Florida during their Christmas break, which coincided with the Chinese New Year. The pair flew into Orlando, Florida on the night of December 30th, 2019. The plan was to rent a car and make their way to the Southernmost Point of the continental U.S., in Key West, Florida, and then drive back to Orlando and board their flight back to Ann Arbor on January 7th, 2020.

On December 31st, the pair went to an outlet mall in Orlando and at night watched the Magic Kingdom's famous New Year's Eve fireworks show. The next day, they went to ICON Park's Museum of Osteology and did some sightseeing. On January 2nd, they rented a car and began to make their way to South Florida. They arrived in Miami later that day, did some quick sightseeing and called it a night. The next day—January 3rd—they visited Shark Valley in the Florida everglades and rented a room at a Holiday Inn in Homestead, Florida. The pair wanted to make sure they were able to get good pictures of Key West's famous sunrise, so they set off for Key West in the early

morning hours of January 4th. They arrived at approximately 7 a.m. and drove directly to Smathers Beach. They took a few pictures and then drove to the McDonald's on North Roosevelt Boulevard. They sat together as they ate their breakfast and planned their next stops. Using the assistance of Google and Yelp, they decided they would go to the Hemingway House and Museum. As they continued to eat and chat, they noticed—through the McDonald's window—an island that appeared to have good picture-taking spots. At that point, they decided they would stop their first and try to take some good pictures of the rising sun, before making their way to the Hemingway House and Museum.

They arrived at the entrance of Dredger's Key a few minutes later. Yuhao, who was driving, approached the checkpoint and lowered his window. A female guard spoke to them in English. At this point, it is important to note that while Yuhao does speak some English—after all he was enrolled in a Master's program at an American university—his English is limited and he is by no means fluent. Much of his coursework does not require English proficiency—there is a reason math is known as the "universal language".

As Yuhao listened to the guard, he heard her say something about a "military ID." Clearly, Yuhao is not in the U.S. Military, and he assumed that the guard did not actually think that he or his roommate could be in the U.S. Military. At that point, Yuhao's roommate handed Yuhao his Chinese ID, and Yuhao passed it on to the guard. The guard looked at the ID and told them she

5

would return it to them on their way out. The guard then lifted the arm gate, and gave them further instructions. Yuhao heard her say the word "U-turn" as she sent them on their way. While Yuhao did not understand everything the guard told them, he also was not particularly concerned. As they drove on the land bridge that connects Dredger's Key to Key West, the roommates briefly discussed what had just happened, and quickly concluded that if they were not supposed to be there they would not have been let in. After all, they had provided a legitimate Chinese identification card, and the guard opened the gate and let them through. Surely, they thought; if this were a sensitive military installation, they would not let two Chinese students, with limited English and foreign IDs, simply drive right in. Unfortunately, that is exactly what happened.

Once the pair drove across the land bridge, they made their way to what appeared to be a beach. They saw RVs parked on the sand and people walking around. Yuhao parked their rental car next to one of the RVs and they both exited. They walked around a bit, even greeting and waiving at other people walking nearby. After a few minutes, they concluded that there was not much to see, and the pair got back in their car and began to make their way off the key. Before reaching the guardhouse, Naval Security Forces pulled them over. They were detained, searched, and subsequently arrested. It only took 20 minutes on Dredger's Key to erase all of the years of studying and hard work Yuhao had dedicated to achieving his American dream.

The evidence in this case makes a few things clear:

1) On January 4, 2020, prior to his arrest, Yuhao answered all questions posed to him by the Naval Security Forces and the Key West Police Department;

2) On January 4, 2020, after his arrest, Yuhao answered all questions posed to him by agents from the Federal Bureau of Investigations ("FBI");

3) On February 20, 2020, after he was indicted and ordered detained, Yuhao voluntarily met with agents from the FBI and Assistant U.S. Attorney Jonathan Kobrinski, and over a period of more than 3 hours, answered all of their questions;

4) On March 10, 2020, Yuhao again voluntarily met with agents from the FBI and Assistant U.S. Attorney Jonathan Kobrinski and again answered all questions posed to him;

5) Since his arrest on January 4, 2020, and throughout all of his interviews and interactions with law enforcement agents and the government, Yuhao's version of events has been honest and consistent;

6) After his arrest, and upon the request of law enforcement, Yuhao gave written consent to search his apartment in Ann Arbor, Michigan, his personal and school email accounts, and his cellular phone and computer;

7

7) The government and the FBI, after a 6-month investigation, which included numerous interviews, the execution of multiple search warrants, the analysis of email accounts, multiple cellular phones, computers and other electronic devices, have concluded that Yuhao does not deserve the maximum sentence. (D.E. 60: 2).

In determining Yuhao's sentence, this Court should consider the cases of other defendants, throughout the country, who have also been convicted of violating 18 U.S.C. § 795, or other comparable statutes.

On September 26, 2018, for example, Zhao Qianli was arrested after entering the JIATF-South military installation property, without permission from the commanding officer, and "*circumnavigating* the installation's primary fence line, and entering the military property from the beach. He then proceeded to take multiple photographs and video footage of military hardware. He eventually pled guilty to one count of violating 18 U.S.C. 795—and on February 5, 2019, this Court sentenced him to one year in jail. *United States v. Zhao Qianli*, No.18-cr-10035-KMM, ECF No. 1, 21, 23 (S.D. Fla. 2018).

On December 26, 2019, Lyuyou Liao was arrested after having entered NAS Key West, Truman Annex, by *circumnavigating rocks and a perimeter fence*, and taking pictures of defense installation. The investigation also showed that Liao "*transmitted* images containing the sensitive equipment to another person via a Chinese-based social media application." The United

States is requesting this Court sentence him to one year in jail—the statutory maximum sentence. *United States v. Lyuyou Liao,* 20-cr-10002-KMM, ECF No. 1, 12, 37 (S.D. Fla. 2020).

On March 30, 2019, Yujing Zhang entered a private event at President Trump's Mar-a-Lago Club, in West Palm Beach, Florida—which is classified as a "Restricted Area" pursuant to 18 U.S.C. § 1752—by ignoring multiple signs and lying to U.S. Secret Service agents and Mar-a-Lago Club staff. Once on the property, she proceeded to make her way to the main reception area where the approved guests were located. Zhang was arrested shortly thereafter by U.S. Secret Services agents, at which point she became verbally aggressive with them. Upon questioning, she admitted that she was there to "familiarize herself with the property and take photographs," and a search of her person revealed four cellular phones, a computer, an external hard drive, and a thumb drive containing malicious malware. Zhang was charged with one count of unlawfully entering restricted grounds and one count of making false statements, in violation of 18 U.S.C. § 1752(a)(1) and 18 U.S.C. § 1001(a)(2), respectively. She did not accept responsibility, proceeded to trial and was found guilty of both counts. Although she was facing a total of six years in prison, on November 25, 2019, she was sentenced to 8 months in prison, as to each count, to run concurrently to each other. *United States v. Yujing Zhang*, No. 19-80056-cr-RKA, ECF 1, 14, 68, 82 (S.D. Fla. 2019).

9

On November 23, 2001, Fei Yei and Ming Zhong were arrested at the San Francisco International Airport, with stolen trade secret information in their luggage while attempting to board a flight bound for China. They subsequently pled guilty to two counts of economic espionage—possessing stolen trade secrets from Sun Microsystems, Inc. and Transmeta Corporation with the intent to benefit the Peoples Republic of China—in violation of 18 U.S.C. § 1831 (a)(3). On November 25, 2008, they were sentenced to 12 months and 1 day in prison, as to each count, to run concurrently to each other. *United States v. Fei Ye,* 02-20145-JW, ECF 1, 268 (N.D.CAL 2008).

Consideration of relative punishment is appropriate here. The facts of this case are clearly distinguishable—and much less egregious—than the cases listed above. It would be unjust, for example, for Yuhao to receive a longer sentence than Yujing Zhang—who trespassed onto the Mar-a-Lago Club, became verbally aggressive with, and lied to, federal agents, admitted she was there to take pictures and familiarize herself with the property, never accepted responsibility and proceeded to trial. It would also be unjust for him to receive the same sentence as Zhao Qianli—who entered a military base surreptitiously and took pictures and video footage of military hardware. Similarly, his conduct and actions pale in comparison to that of Fei Yei and Ming Zhong—who admitted to committing economic espionage.

One way or another, all of those defendants attempted to conceal themselves and their actions by either circumnavigating physical barriers,

10

lying to federal agents, or stealing and concealing trade secrets. Because Yuhao's actions in this case are different, this Court should treat him differently.

## II.   The numbers do not lie: Yuhao's criminal history, academic achievements, and extensive support system suggest that he is unlikely to recidivate

The factors promulgated by the U.S. Sentencing Commission, and in 18 U.S.C. §3553, work to further the basic purposes of criminal punishment: deterrence, incapacitation, just punishment, and rehabilitation.[3] Nothing suggests that, those purposes can only be achieved by prolonged incarceration.

Multiple factors indicate that Yuhao is already unlikely to reoffend. A U.S. Sentencing Commission 2016 study on recidivism, for example, found that offenders with low criminal history categories are also among the least likely to recidivate.[4] With a criminal history sore of zero, Yuhao falls within this group:



Recidivism and Criminal History

- To protect the public from further crimes of defendants, during the development of the criminal history guideline provisions in the mid-to-late1980s the Commission considered the relationship between offenders' prior criminal record and their likelihood of reoffending.[5]

- The Commission's recidivism study found that recidivism rates generally increase as offenders' criminal history calculations increase (thereby increasing an offender's sentencing range).[6] This finding confirms that the criminal history guideline provisions continue to work as designed.

Recidivism Rates by Criminal History Category

| Criminal History Category | Category I | Category II | Category III | Category IV | Category V | Category VI |
|---|---|---|---|---|---|---|
| Rearrest Rate | 33.8% | 54.3% | 63.3% | 74.7% | 77.8% | 80.1% |
| Reconviction Rate | 19.9% | 33.0% | 41.3% | 51.6% | 56.6% | 59.3% |
| Reincarceration Rate | 14.0% | 23.9% | 32.9% | 43.5% | 49.4% | 51.3% |

---

[3] USSG §1.A.2

[4] *See* U.S. Sentencing Commission, Recidivism Among Federal Offenders: A Comprehensive Overview 3 (2016),http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research_publications/2016/recidivism_overview.pdf.

Yuhao's strong social ties also suggest that he is less likely to recidivate than the average defendant. Criminological research has shown that family support is a key factor in helping offenders find their way in society after a criminal conviction. An April 2011 study by Mark T. Berg and Beth M. Huebner (a sociologist and criminologist, respectively) came to three important conclusions:[5]

1) Offenders employed and had good quality ties to relatives were less likely to recidivate;

2) Offenders with good quality ties to relatives were more likely to be employed in the follow-up period;

3) A history of frequent unemployment reduced post-release employment.

They concluded that this is largely because, "….relative to the wider community, the family is more apt to overlook offenders' stigma—a phenomenon that facilitates the formation of social ties between offenders and members of their family."[6] Yuhao comes from a very close-knit family.

His parents and grandparents are eagerly awaiting his return. They have suffered every day since his arrest.  As if having to worry about their only child incarcerated in a foreign country was not enough, within days of

---

[5] Berg, Mark T., Huebner, Beth M. (2011). Reentry and the Ties that Bind: An Examination of Social Ties, Employment, and Recidivism. *Justice Quarterly, Volume 28, Number 2,* 402.
[6] Eckland-Olson, S., Supancic, M., Campbell, J., & Lenihan, K. (1983). Postrelease depression and the importance of familial support. *Criminology, 21*, 253–275.

Yuhao's arrest COVID-19 forced his entire family in China into quarantine. As time went on, COVID-19 spread to the United States, and Yuhao's family became even more concerned for his safety. This is his mother's worst nightmare.

  

  

Since his arrest, Yuhao has received an outpouring of support from family, friends, and University of Michigan professors and classmates—many whom have written letters of support. Their descriptions of his character speak volumes. As important, is Yuhao's academic record. His high marks and the Academic Statement of Purpose and Personal Statement he submitted when applying to the University of Michigan's Electrical and Computer Engineering Master's Program shed light into his ethics, potential, and character. To the end, the following exhibits are attached:

1)   **Exhibit A:** Letter of support from Yuhao's mother, Ms. Jixiang Zhou;

2)   **Exhibit B:** Letter of support from classmate Beiling He;

3)   **Exhibit C:** Letter of support from classmate Chao Huang;

4)   **Exhibit D:** Letter of support from classmate Hanwen Miao;

5)   **Exhibit E:** Letter of support from classmate Junzhe Xu;

6)   **Exhibit F:** Letter of support from classmate Zizheng Zhang;

7)   **Exhibit G:** Letter of Good Standing from Professor Mingyan Liu;

8)   **Exhibit H:** Letter of Good Standing from Professor Vizwanath Nagarajan;

9)   **Exhibit I:**  Academic Transcript from Xi'an Jiaotong-Liverpool University;

10)  **Exhibit J:** Bachelor's Degree from Xi'an Jiaotong-Liverpool University;

11)  **Exhibit K:** Certificate of Bachelor's Degree from Xi'an Jiaotong-Liverpool University;

12)  **Exhibit L:** Certificate of Graduation from Xi'an Jiaotong-Liverpool University;

13)  **Exhibit M:** University of Michigan Academic Transcripts;

14)  **Exhibit N:** Academic Statement of Purpose from University of Michigan application;

15)  **Exhibit O:** Personal Statement Purpose from University of Michigan application

**III.   A lengthy sentence, especially given the extraordinary circumstances surrounding the ongoing COVID-19 pandemic, would place him in unnecessary danger and would do more harm than good.**

Yuhao will eventually return to China after months of being apart from his family and loved ones. Despite being one credit shy of graduating with a Master's Degree from the University of Michigan, he may need to start over at a different school in China. He will need to reintegrate into society, and deal with the stigma of being deported from the United States. As if that were not enough, he also needs to worry about the COVID-19 pandemic sweeping the nation.

14

The United States has become the epicenter of COVID-19—with more recorded cases and deaths than any other country.[7] On March 13, 2020, the President of the United States declared a national emergency due to the evolving threat posed by the spread of the coronavirus in the United States. The Centers for Disease Control and Prevention ("CDC") has advised that the coronavirus is "spread mainly from person-to-person . . . [b]etween people who are in close contact with one another . . . [t]hrough respiratory droplets produced when an infected person coughs, sneezes, or talks."[8] The droplets can land in the mouths or noses, or can be inhaled into the lungs, of people who are within about six feet of the infected person.[9]

COVID-19 is highly contagious, and those who are infected can spread the virus even if they are asymptomatic.[10] Additionally, studies have shown that COVID-19 can survive from three hours to three days on various surfaces.[11] At this time, there is no known treatment, vaccine or cure for COVID-19.[12]

---

[7] *See* "Coronavirus Map: Tracking the Spread of the Outbreak," The New York Times, Mar. 18, 2020, at https://www.nytimes.com/interactive/2020/world/coronavirus-maps.html (updating regularly).

[8] *See* CDC, Coronavirus Disease 2019 (COVID-19), How It Spreads, at https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html.

[9] *Id.*

[10] *See* Marco Cascella et al., "Features, Evaluation and Treatment Coronavirus (COVID-19)," National Center for Biotechnology Information ("NCBI"), Mar. 20, 2020, at https://www.ncbi.nlm.nih.gov/books/NBK554776/#_ncbi_dlg_citbx_NBK554776.

[11] *See* National Institute of Allergy and Infectious Diseases, "New coronavirus stable for hours on surfaces," Mar. 17, 2020, at https://www.nih.gov/news-events/news-releases/new-coronavirus-stable-hours-surfaces.

[12] *See* CDC, "Coronavirus Fact Sheet," Mar. 20, 2020, at https://www.cdc.gov/coronavirus/2019-ncov/downloads/2019-ncov-factsheet.pdf.

As a result, the growing public health consensus is that the Bureau of Prison ("BOP") must rapidly decarcerate to prevent a catastrophe of epic proportions in prisons and jails. In fact, on March 27, 2020, a group of public health officials from this country's top public health and medical institutions sent a letter to the President, explaining that effective COVID-19 mitigation is "impossible to achieve in or federal prisons and immigration facilities," and urging rapid decarceration.[13] These experts ominously noted that prisons and jails "face the same risks as cruise ships and nursing homes when dealing with COVID-19."[14]

The BOP's own staff tell a similar story.[15] Particularly disturbing is reporting indicating that the BOP's chief health officer has advised officers to continue working even if exposed to COVID-19, as long as they remain asymptomatic.[16] This only further accelerates the risk of COVID-19 spreading like wildfire inside jails and prisons. In fact, it is this fear of asymptomatic

---

[13] Letter from leading public health officials to President Trump, Mar. 27, 2020, at https://thejusticecollaborative.com/wp-content/uploads/2020/03/Public-Health-Expert-Letter-to-Trump.pdf

[14] *Id.*

[15] *See, e.g.*, Keegan Hamilton, "Sick Staff, Inmate Transfers, and No Tests: How the U.S. Is Failing Federal Inmates as Coronavirus Hits," Vice News, Mar. 24, 2020, at https://www.vice.com/en_us/article/jge4vg/sick-staff-inmate-transfers-and-no-testshow-the-us-is-failing-federal-inmates-as-coronavirus-hits ([C]orrectional officers at multiple Bureau of Prisons facilities" describe an "underprepared" agency "already on the brink of disaster."); Joseph Darius Jaafari, "Federal government said it halted prison transfers. They're still happening.," PA Post, Mar. 23, 2020, at https://papost.org/2020/03/23/federal-government-said-it-haltedprison-transfers-theyre-still-happening/ (noting that despite assurances to the contrary, the BOP continues to accept inmates and transfer into BOP custody inmates from "high-risk" areas, drawing ire from congressmen and corrections union officials).

[16] *See* The Marshall Project, "Federal Prisons Agency 'Put Staff in Harm's Way' of Coronavirus," Apr. 3, 2020, at https://www.themarshallproject.org/2020/04/03/federal-prisons-agency-put-staff-in-harm-s-way-of-coronavirus?utm_medium=social&utm_campaign=sprout&utm_source=twitter.

individuals unwittingly spreading COVID-19 that has prompted the CDC to issue updated guidance recommending that all individuals wear a cloth face covering when in public settings to slow the spread of the coronavirus.[17]

Attorney General Barr has recognized the dire circumstances faced by the BOP in its attempts to contain the spread of COVID-19, and has issued two memoranda to the Director of the BOP—one on March 26, 2020 and another on April 3, 2020–outlining a new policy by the United States Department of Justice ("DOJ") to attempt reduce the prison population.[18]

Moreover, the CDC has recognized that correctional facilities themselves "present[ ] unique challenges for the control of COVID-19 transmission among incarcerated/detained persons, staff, and visitors" because many detention conditions create a heightened risk of danger to detainees, including: low capacity for patient volume, insufficient quarantine space, insufficient on-site medical staff, highly congregational environments, inability of most patients to leave the facility, and limited ability of incarcerated/detained persons to exercise effective disease prevention measures (*e.g.*, social distancing and frequent handwashing).[19]

---

[17] CDC, "Recommendations for Cloth Face Covers," Apr. 3, 2020, at https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover.html

[18] *See* Ex. P: "Memorandum for Director of Bureau of Prisons: Increasing Use of Home Confinement at Institutions Most Affected by COVID-19," Office of Attorney General, Apr. 3, 2020, and Ex. Q: "Memorandum for Director of Bureau of Prisons: Prioritization of Home Confinement as Appropriate in Response to COVID-19 Pandemic," Office of Attorney General, Mar. 26, 2020.

[19] CDC, "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities," Mar. 23, 2020, at https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html

17

## Conclusion

This is an unprecedented time in our nation's history, filled with uncertainty, anxiety, and fear. The need to decarcerate is real. Yuhao is not the kind of inmate that needs further incarceration. Even when his criminal sentence is over, he will be detained at an immigration detention center—and risk further exposure to COVID-19—for an undetermined length of time.

Under these circumstances, Yuhao Wang respectfully requests that this Court sentence him to 6 months in jail, so that he may return to China as soon as possible, and have the ability to live with his family in comparative safety. Nothings suggests that a longer sentence is necessary to ensure just punishment and deter future criminal conduct.

Respectfully submitted,

MICHAEL CARUSO

FEDERAL PUBLIC DEFENDER

BY:   s/*Juan J. Michelen*
Juan J. Michelen
Assistant Federal Public Defender
Florida Bar No. 92901
One East Broward Boulevard, Suite 1100
Fort Lauderdale, Florida 33301-1842
Tel: 954-356-7436
E-Mail: Juan_Michelen@fd.org

18

## CERTIFICATE OF SERVICE

I HEREBY certify that on May 31, 2020, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

*s/ Juan J. Michelen*

Juan J. Michelen